We're happy to hear argument in our third case, number 152511, as soon as the lawyers can get themselves up. Please be seated. Counsel, one of you must be representing the appellant here. Your Honor, I'm here on behalf of the petition of the second case. I think you mentioned the third. Oh, did I say the third? You did. No, I meant the second. Sorry, that was my hesitation. So sorry. No problem. May it please the Court, James Tice on behalf of petitioners Luz Cantillano and her minor son Johnny. Tice, I apologize. No, no problem. The narrow dispute between the parties is whether a wife threatened for searching for her missing husband, like a mother threatened for refusing to let a gang recruit her son, is persecuted in central part on account of that family relationship. The answer is yes. As long as the family relationship is at least a central reason for her persecution, not necessarily the main reason, as the agency incorrectly believes, Ms. Cantillano is eligible for asylum. So you're saying Hernando Zavalos is indistinguishable legally? Legally it is indistinguishable. That is our position, Your Honor. And the government wants this case to be about reweighing the evidence, but in our view, as Your Honor alluded to, the agency's error was in fact a legal one. To be clear, this Court can accept, we believe, all of the narrative facts as found by the agency and still hold in light of Hernando Zavalos that Ms. Cantillano has satisfied the nexus requirement and is eligible for asylum as a matter of law, therefore. The IJ's evidentiary findings were based on Ms. Cantillano's credible testimony. The government offered no rebuttal evidence, and that evidence revealed that she was essentially told to stop looking for your husband or else. And that threat, we believe, is not meaningfully different from telling a mother, let your son join our gang or else. Where do we find the definition of a nuclear family? Nuclear family, Your Honor, I think it was a group proposed. It was just the family bond, the husband and wife. Well, correct me if I'm wrong, but I thought the fact that the uncle was included here was one of the reasons why the administrative agency was denying her any relief. Right. So is the uncle part of the nuclear family from your definition? I was not so sure he wasn't. No, Your Honor, I think a case could be made that he actually is. That was not the way it was presented below, but I think that as this Court has recognized in a number of cases, you know, it has a more functional test of what the particular social group is. And I think if the uncle had been here seeking asylum based on his own threats, they very well might have been considered part of the same social group. We're not speaking to each other. I thought part of the rationale for denying her benefits were other people were the same thing was said to them, and they didn't leave the country, and therefore she didn't have a good reason to leave. And the other people being the uncle. Right. So what I'm asking you is how do you distinguish her from the uncle? Oh, of course. I apologize. Yeah, well, first of all, a few points. First of all, there's some dispute in the record about exactly whether the uncle was there. There is. I can give you that. Given the standard of review. Translation is terrible. I'm sure you didn't represent her then. You only took that dollar. Given the standard of review, we won't dispute that. But I think a few responses. One of them is that this court has never held that you have to prove that every other person in similar circumstances has to be persecuted in the same respect. Just because several members of a family are persecuted but not others is not the test, and that's what this court held in both Cordova and in Hernandez-Avalos. The fact that other family members remained in El Salvador in those cases and were not persecuted, that did not. Arguably, and what the administrative agency said was, if these other people were threatened, that means the uncle was threatened. Right. I thought your argument was going to be, A, the record is not clear that he was threatened, and B, he's not part of the nuclear family. But instead of saying that, he went. And maybe even C, that if he was threatened there at the dock, it was not the continuing, ongoing, threatening situation that you have with your client and her family. That's absolutely my next point, Your Honor. Thank you. I didn't mean to interrupt you. That was my next point. You're going to adopt all three of those, right? Absolutely. The type of persecution that the uncle faced, according to this record, is distinguishable both qualitatively and quantitatively. The uncle was threatened at that time. Ms. Cantiana was threatened for a period of two years subsequent to her initial visit to the docks. And long after, she both told her persecutor that she would not report him to the police and, in fact, did not report him to the police. Indeed, even after she left Honduras and entered the United States, her persecutor continued to ask questions about her and continued to pursue her. This is just a different form of threat. Did she ever tell him that she wasn't going to file a report? She did. She told him that. That's part of the record. I can find the exact same thing if you'd like. But she told him that was part of her testimony, and I believe it was part of her declaration as well, that she told him that she would not file a police report, and yet he continued to pursue her. And that's really the point here, Your Honor. We think that there was nothing that she could have done. There was something immutable about her family relationship, which is why the persecutor continued to target her, notwithstanding the fact that she was not taking any provoking acts. She was not doing anything. She had to flee because she felt that there was nothing she could do at that point. The persecutor was going to try another way. Is there anything in the record that addresses whether the uncle knew about the alleged drug dealing of Mr. Avila? I don't believe that's part of the record, Your Honor. And that's yet another. . . You say that would be a basis for distinguishing. That's yet another fact that would distinguish the uncle because, again. . . Now we have a D. Now we have a D. And the point I was making to Judge Motz earlier, my B, which I suppose should have been my E, was that it's somewhat of a red herring. They think that, you know, arguably you could have said in that uncle situation, well, he's close enough to the family that it's a similar sort of circumstance. That's not the case here. The social group that we have is the nuclear family. Because that's why I asked you what a nuclear family was. I just. . . Circled around here. I misunderstood your question. But I was just trying to make the point that it's somewhat of a red herring as well because it's not his. . . Well, what is the definition of a nuclear family? It's the mother, father, and children, the family. This is the nucleus, the mother, father, and the. . . Regardless of whether they were legally married or not because they were not. Regardless of whether. And I don't believe the government makes any distinction between that. I think in their brief. . . He can be ready for that question. In their brief they acknowledge. . . No, they don't. The fact that they were essentially treated as married by society. So why was this an error of law rather than a misapplication of fact? Well, for a few reasons, Your Honor. First of all, as we point out, the IJ's finding, which was the reasoning was adopted and affirmed by the board, was that the main reason for her persecution was this witness intimidation rationale essentially. And that was the same sort of legal error that was at issue in Hernandez-Avalos. They said, you know, it doesn't matter that something was the primary reason. The question is whether it's inextricably related to the two forms of persecution. So we think that on that basis alone, that's a legal error. But I think it's also, if you have a case, as we do here, Hernandez-Avalos and also Cordova, is another case I think with very similar facts, where this court has said under these facts, this is the, you know, this is how we determine nexus. And if the facts are materially distinguishable, that's really an error of law. And to give you a concrete example, in Hernandez-Avalos itself, for example, one of the issues was whether or not the petitioner had faced past persecution. And in that case, she had received death threats in the past. And what this court said was when someone has received death threats, that constitutes past persecution. Notwithstanding that, the board said, well, she did not face past persecution even though she had death threats. And what this court said was, no, under our precedent, death threats constitute past persecution. It's the same thing in this situation. And to put an even finer point on it, Your Honor, if the facts were materially, or excuse me, absolutely identical to Hernandez-Avalos rather than just, we think, identical in all material respects, this court would find that if the board did not follow Hernandez-Avalos, that would be a legal error as well rather than a factual one. Well, isn't a nexus determination really a mixed question? It is. Because you are applying the facts that were found to the concept. It is, Your Honor, and it's true. And what have we said about that? Have we said anything about a mixed question in terms of reviewability? I mean, I know it's a pretty clear distinction between legal issues and factual issues. What have we said about mixed questions? Your Honor, what I know is the way this court treated it, the way the court treated Hernandez-Avalos. I'm not sure if this court has ever specified mixed questions versus legal versus factual ones. But I know the way it was treated in Hernandez-Avalos, and it was essentially that it was an abuse of discretion under that circumstance to find that these were not inextricably related. And we think that is consistent with legal error because a court, or in this case, an agency abuses its discretion when it commits a clear error of law. So we think the result is the same either way. And that's why I think, again, under the facts of Hernandez-Avalos, we have this identical, you know, for material purposes where the threat is inextricably intertwined. The same result should obtain. I'll point the court to a few places in the record, I think, which helps make this clear. Before you do that, maybe since you've been talking about this Hernandez-Avalos case, maybe you want to talk about Footnote 7. Sure, I'd be happy to. So Footnote 7, of course, as Your Honor notes, indicates that just because, you know, the family is related or mentioned as part of the threat, that does not necessarily mean in every case you're going to find a, you're not going to find a, that is therefore inextricably related. We think that that's clearly the case. It can't simply be that just because someone mentioned a family member that that could be sufficient. But we think that this case, obviously, is very different. We have, you know, undisputed facts that she was persecuted for a period of over two years. We think this might be a different case and a harder argument for us if she had gone to the docs one time, had been threatened, and then never was threatened again. But under the facts of this case, she was persecuted for years, literally following that up. And her family and her children were threatened as well, indirectly through her, not directly. But it's a very different case from even the example mentioned in Hernandez-Avalos, where it was somebody received an initial threat, and then the court said maybe that would not be a threat. I don't think it decided the question. It just said that's a harder case. But then it said the subsequent threats, where clearly the threat was inextricably intertwined. That's really the key. And, again, I think if you look at some of the points in the record, you can see where, you know, in her declaration at AR 197, she characterized the threats as, I should not make a police report about what happened to my husband. I should not report my husband's disappearance. And, indeed, if you look at the government's brief, the government on pages 19 and 20 of its brief suggests that the family relationship was somehow incidental or superficial here. But we think it's absolutely integral. The government argues that, you know, the familial ties to, and what they say is Mr. Martinez, but I'll substitute her husband to make the point here. Familial ties to her husband were nothing more than incidental, superficial, et cetera, to Mr. Avila's desire to prevent her from reporting her husband's disappearance. Again, I don't think you can separate, even if you think the main reason why Mr. Avila was persecuting her was because he was worried that she might report him to the police. At least one central reason for threatening the widow of the man he murdered was, under this court's precedent, we think, at least one central reason. If you have no further questions, I think I'll reserve the balance of my time. Thank you. Thank you very much. Mr. Yosef? Good morning, Your Honors. Good morning. May it please the Court, the attorney general. The central issue in this case, as my colleague mentioned, is the question of whether or not the petitioner established that the harm she endured was on account of a protected ground, namely her membership in a particular social group comprised of the nuclear family members of Johnny Martinez. Before I get into the factual analysis, I think it's important to note that the standard of review here is substantial evidence, which requires that, not that the record may support an alternative conclusion, but the record must compel an alternative conclusion, and that the agency's denial of asylum claim was manifestly contrary to the law. The government states that that is not present in this case. The petitioner has not demonstrated that the record would compel reversal of the agency's conclusion. Does the government concede that the petitioner was part of the nuclear family of Mr. Martinez? Yes, the agency did not make any distinction between the nature of the domiciled relationship or whether or not they were married. I don't think that was relevant to their consideration. And I appreciate that answer, but the direct answer to your question was, does the government concede that she is part of his nuclear family? Yes, we would, as the agency made that as the basis of their analysis. As it relates to the nexus analysis, this is under at least the one central reason standard, and the focus of that, We Must Begin, is based on what the persecutor's motive for choosing and targeting the individual was here. While there can be multiple central reasons, the proposed social group in this case cannot be incidental, tangential, subordinate, or superficial. And we believe that is the case here. The familial ties may have been the reason why the petitioner began pursuing information about the disappearance of her husband. Of course, that is understandable. The immigration judge had took note of this. The initial threats commenced at the moment the belief that the uncle was going to report the individual, Mr. Avila, to the police. The threats commenced at that point. But for the petitioner going to the docs... Where on the record does it say, you just limited that to the uncle. Oh, sorry. I was trying to lay out what exactly happened. She and the uncle went to... Right. She was there. She was there. She and the uncle went to the docs searching for her husband. Have you reviewed that part of the transcript? Yes, I have, Your Honor. It's a little unclear, isn't it? It is, Your Honor. It is unclear in terms of the circumstances of who the threat was targeted to and specifically kind of what happened in the uncle's involvement. When she says right before the part that you rely on, she says he threatened her. And then you turn the page, and she is referring to him. And it may be that she's referring to him, her husband, common-law husband, not to him, the uncle. I understand that. And I would point to during the testimony of the expert witness, there was the government counsel in terms of trying to give some clarity to the factual circumstances. During the testimony of the expert witness, government counsel phrased the question in terms of that it was the uncle and the petitioner here who were threatened. And the expert witness indicated, yes, that seems to be the case. And there was no objection on the part of petitioner's counsel during the hearing as to the characterization of what occurred during that time. That's it. I can point it to the record if you like. Was the uncle threatened more than once? Based on the record, there is no indication. But I would also state the fact that the petitioner in her own testimony conceded that she was not in touch with the uncle, that there was no communication between them. So we don't know exactly what happened with the uncle at the period of time after that initial interaction with the, I guess the initial threat by Mr. Avila. So there's nothing in the record to say that he was or wasn't. We simply don't know based on the factual record. We do know that she was repeatedly threatened. Yes, we do know. So how do you disentangle her family relationship, the fact that she was the wife of Mr. Martinez, from these threats? Specifically, as the agency had stated, in each instance when a threat was made, a threat was made specifically where Mr. Avila cited his efforts to prevent her from going and filing a report with the police. In each instance of a threat or… Why would he be focusing on her filing a report with the police? Based on, if you look at the record in terms of the number of times that she went to, she went to the docks the first time. She went to the docks more… Why did she go to the docks? To look for her husband. That is correct. She would be the person most concerned with her husband. If we're looking at the nuclear family of Johnny Martinez, his mother would also be very concerned, as well as her son would also be very concerned. They would have the same motivation. So what do you think the nuclear family is? As to just the traditional definition, it would be the parents, children, and siblings of the individual. Yeah, but as you have grandparents and great-grandparents and great-great-grandparents, those great-great-grandparents are not the nuclear family of the person, right? I wouldn't say so. That would be, I guess, under the extended family definition. Indeed. So it seems to me that over time, your nuclear family changes. I'm a child. I think like a child. Growing up, I have a different nuclear family, right? Yes. If we look at the defining member here, Johnny Martinez, we would look at his children, his siblings, and his parents. Or his wife. Or his wife, of course, would be included. But not his parents once he gets married. They're no longer his nuclear family. People who live with him. Okay. I'm just going by the dictionary. I was interested in you telling me a different definition. Your colleague is kind of – nobody wants to tell me what a nuclear family is. But we would still include his mother. So you think it's extended – well, if it's his mother, is it his mother if she's 80 years old and he doesn't live with her? My understanding of the definition of a nuclear family would include someone's parents. As long as they're living with them, yes. There was no factual determination made as to define what the nuclear family was made. What we have is that we have other members. I don't believe that's the case. But he did have an eldest son who was also – I believe he may have been living with him. I'd have to check the record on that. But those two individuals who have just as much of an invested interest in finding out whether either their father or son was their whereabouts, if anything bad happened to him, they would also be just as invested as a spouse in terms of finding out. They will maybe. But what we're doing is using the nuclear family as a marker for the person most likely, and the person most likely to be involved and interested would be a person who lives with them. I would say that would be the case, but that wasn't – I mean, once you go out to college, it's like an argument. There's nothing in the law that says that everybody in a nuclear family has to inquire. Is there? I mean, it seems to me that you're turning this upside down logically, that you're suggesting that if everybody didn't inquire, then it's not valid for one person to assert the existence of the family relationship as the reason for the fear of persecution. With due respect, Your Honor, I don't believe – I'm not attempting to classify that everyone has to – everyone in the family has to inquire. All of the family members must do so. But then what is the rationale for the decision here? Because it seemed to me it relied pretty heavily on the fact that the uncle wasn't persecuted. I mean, they also relied on the fact of what was the – again, we look at the persecutor's motive. The motive, as expressly stated over and over again, was to prevent her from going to the police. There was no indication that it was because you are a family member of this individual I'm targeting you. She went to the dock. She was the family member that was most – I mean, arguably, there's something in the record that suggested the contrary, that was most interested, most involved, shown by the fact that she was the one that repeatedly did this. The family membership meant more to her than it did to the uncle. But we also have to look at the family membership as it is related to the persecutor in this case. Was that at least one central reason for his targeting of her? There is no indication that that's why he specifically sought her out. She knew he was a drug dealer. There's no evidence that Mr. Avila knew that anyone else in that family relationship knew that he was a drug dealer. It's actually unclear from the record whether or not she knew he was a drug dealer. He never made any statements during his threats as to trying to prevent her from – He was going to be leaving Mr. Avila's employ because he had thought arguably that he was a fisherman and then found out that he was running drugs. I thought that too. That was the case, that the individual – She knew that then. She knew he was a drug dealer. That's pretty powerful information. Whether or not he knew that she knew is a different question entirely. We don't know if Mr. Avila was aware of her knowledge of his criminal enterprise. We don't know that. She only found out a week before the disappearance occurred, a week before he left on the fishing trip that resulted in his disappearance. We don't know that she's aware, that Mr. Avila never intimated. There's nothing in the record to show that he was aware of it. Of course, I understand there's the common sense kind of assumption that the husband shared with his wife what was going on, but we don't have that in the record. She even testified that she wasn't sure if he had any knowledge of her awareness. Based on the record, that's a factual information that indicates that her awareness is not clear. Her awareness is that Mr. Avila's criminal enterprise was actually something that Mr. Avila was aware of. I'm not sure I understood what you just said. Well, Paige, I think I understand what you're saying. You're saying that there's no indication that Mrs. Cruz was aware of the fact that Mr. Avila was involved in drug trafficking. Is that what you just said? She eventually did become aware, yes. Right. She became aware before her husband disappeared. That is correct. Okay. So what was it? At which JA-87 says it. Yes, he's agreed that, but he said something else. It was specifically indicating that she, in her own testimony, indicated she wasn't aware if Mr. Avila knew that she knew the information. I mean, I understand that, based on the testimony, that seems to indicate she was merely speculating as to whether or not her husband had notified him or if Mr. Avila had somehow become aware of this. Go ahead. No, it's fine. So the court below, and you are arguing that she was targeted to keep her from reporting his drug trafficking, or to keep her from reporting the disappearance to the police and not because she was his wife. But he only threatened her. He didn't go down to the dock and threaten everybody down there, don't report him missing. He threatened her and maybe the uncle. Once. Once. Maybe. So how is it not connected to the fact that she was his wife? Well, the causation here is that she went looking for him. The individual came, Mr. Avila saw someone interested, a family member interested, and that's what brought the attention. She even testified that no one else in her family was targeted, and she explained, well, nobody else went looking for him. Right. So that's why they were targeted. So that shows that her efforts in pursuing the disappearance and the subsequent threats, the resulting threats that she received, were the reasons that she was targeted, not because of this family connection. Well, I don't understand how you can make that claim, because you could have loveless people in your family, people that don't like you and people that do. And if you have such a family, then you'd have no family connection? That can't be the law. As the immigration judge stated, the familial relationship was not the reason she was targeted. It was their familial relationship, but not other people's. But if anyone else went looking for, say, a former employer or a friend of Mr. Martinez, went looking down at the docks for him, there is a good chance that they would have also been threatened by Ms. Treville to not go to the police. So the familial connection here is tangential to the fact that she was threatened. Of course, it makes sense that she went down there based on her family relationship. But the threats and the continued threats, we have record evidence from her own testimony saying he kept bringing up the police situation. He was attempting to prevent her from going to the police. As she's the one that went from June 2012, she went to the docks. A year later, she went back to the docks. And then in June 2014, when he threatened her once more, he had heard that she was going to go to the police. In each of these instances, there was a clear indication that she was attempting to investigate, and he viewed it as a threat in terms of her going to the police, which resulted in him threatening her himself. So I would say that Hernandez-Avalos was discussed here. And that case is distinguishable based on the fact that the mother and son relationship is inextricably linked. They targeted the mother based on the maternal relationship, that relationship where she could essentially force her son, if she wanted to, to join that gang. We don't have that familial connection. So we would have had to have evidence here where she testified that he said, I am coming and threatening you because you are the wife. Then she would have had a case? I can't speak to that. That would be something that the agency would have to say. I don't know if it has to be that specific. Okay. I guess I don't understand. Maybe you had a question. I don't understand the government's position. Well, it just seems to me that, you know, I always like to think about how I would explain the law to somebody who is educated but not familiar with the law. And how do you explain the distinction that you're making to somebody? What possible, I mean, you haven't given us any logical reason. I mean, we know the husband, Mr. Avila, would come back to the house to pick up the husband, right? So we do know that. That's in the record. He knew where they lived, okay? He knew where to threaten her. He knew where her dogs might be so that he could kill her dogs. He had that focal point of reference. He may not have known where the uncle lived. He may have had no basis for finding. How do you explain that just as a matter of common sense, drawing a distinction, saying that the fact that she is his wife is tangential? I mean, this was the center of Mr. Martinez's life, that home where Mr. Avila concentrated his threats after Mr. Martinez disappeared. It just seems to me that, I mean, how do you separate the two? It just, I don't know how I would possibly explain that to anybody, how the law has a basis for separating those two. I would say we need to look at the persecutor's motive. We need to understand why he was targeting her. And we know that she is a member of this group, of this social group, but we don't know why, we don't know that he was targeting her because of her membership in the social group. That's the question here. That's what the petitioner has to demonstrate. They have to demonstrate that they were targeted because of this membership. They have to show that, they have to provide evidence to indicate that I was targeted because I'm the wife of this individual. And in making these factual determinations, the agency looks at the evidence. And the evidence here, we do have other family members who were not targeted. So that makes, that provides us the question of, okay, well, was she, was the familial ties a central reason? The agency decided that it was not. They decided that it was tangential. It was subordinate to the fact that he was attempting to prevent her from going to the police. So based on that factual record, the agency made such a conclusion. And I would state that the record doesn't compel the conclusion, a contrary conclusion here. We have no evidence, we have no specific statements, no direct evidence that she was targeted because she was in this family. We have the common sense thoughts. We can consider that, of course, a family member would go there. But we don't have evidence in this record to show that. What we have is an individual stating their reasons, the persecutor stating his motive, being to prevent someone from going to the police, and the persecutor repeatedly citing this basis for targeting the individual. And we have other family members who were not targeted here. The familial ties here was not inextricably linked to the harm she endured. As it was in Hernandez-Avalos. The mother and son relationship was central in that claim. Here, the familial relationship, while it makes sense that a wife would be the one to pursue information on her husband, the persecutor here did not make that – there was no evidence to make it clear that he was targeting her based on that relationship specifically. And if my time is running out, I would just conclude to say that the record does not compel reversal of the agency's conclusion and the petition for review should be denied. Thank you for your time, Your Honor. Thanks very much. I'd like to make a few brief points in rebuttal. The first one is the record issue we spoke about earlier. On page AR-105 and 106, the record makes clear that she told him very explicitly that she was not going to report him to the police. I can read from that portion. She said, on cross-examination, I told him that I wasn't going to say – well, I'm sorry. I told him that I wasn't going to say anything that I did, and I wasn't going to say anything to anybody. And then the government asked, what did he say? I replied to you. She says that I didn't know if I talked what kind of people I was going to be involved with. Government, so you assured him that you had no intention of talking? Yes. And then he came to your house again in July of 2014, correct? Yes. And then she asks again, do you know why he didn't believe you the first time? She says, I don't know. Did she keep telling him that she was going to file a police report? She did not, Your Honor. I think that there's some discrepancy in the record about whether she did that very first time at the dock. I think she testified that it was the uncle, I.J., that they both had threatened to file a police report. Subsequent interactions. She went back to the dock again, not looking for a villa, looking for her husband, ran into a villa there. There's, again, some dispute about what exactly happened there. The way I read the record is that she did not personally threaten it, but I know there was some dispute about that. But it's very clear that she told him very clearly as of 2013, no later, that she was not going to report him to the police. And she had no interest in doing so, and the threats persisted. And we think that kind of continuing pursuit exemplifies why, on these facts, the only conclusion that this court can draw is the same one as in Hernandez-Zavalo's, which is that when you have facts like these, there's only, you know, whether you treat it as a question of law, which we think is appropriate, or you just do what Hernandez-Zavalo's itself did, which is to say no reasonable fact finder can conclude, based on these facts, that she was not being persecuted, at least in central part, because of this relationship. Again, it does not have to be the main reason, but it just has to be at least in central part. And I think relevant to that point is the point we were talking about earlier. You were asking the government's counsel about the threat to the individual. And I don't think any of this court's cases have ever said the threat has to be directly tied to, you know, the family member. It doesn't have to say, because you're your brother's brother, I'm going to kill you for that reason. That's never been this court's requirement. And in Cordova, it was a gang recruitment situation. In Hernandez-Zavalo's, it was let your son join the gang. It wasn't, you know, tied to, you know. And I believe in Crespin, a case from 2011, I believe, it was a similar situation where someone was actually intimidated for being a witness. And all the threats in that case were, you know, you don't testify or else. But he was testifying to the murder of his cousin in this court held. Because that's the way people speak. The drug trafficker's not going to go to her and say, I am here threatening you because you are the wife of. Exactly, exactly. That's illogical. Very much so, Your Honor. And I think that the record, there's lots of evidence in the record that the reason why she was being persecuted, again, if anything more was needed, I think from the very beginning, from her credible fear interview, she was asked, why is Danny threatening you? And she replied, he thinks that my husband told me about the things that he did. It was certainly her belief that based on her prior interactions, knowing that Danny knew her, that she was, that the information she had or the unique motivation or persistence she might have had in continuing to investigate his disappearance, those were the reasons why she and not someone else was in the position she was and that she could not get out of it. The last point I'll make, unless there's any further questions, Your Honor, is just to go back to the standard review point once more. And, again, I just think it's important to note that, you know, whether this is treated as de novo review or substantial evidence, it really makes no difference given Hernandez-Avalos. If we don't grant cat relief, the best you can get is a revamp. Well, that's not what happened in Hernandez-Avalos, Your Honor. Oh, yes, it is. I mean, well, it was a remand, but with the court declaring that she was eligible for asylum, that she had met the prerequisites. So we would be perfectly happy with that result, too. Of course, we're petitioning for review of a final agency order. All you can do is vacate the order and remand or reverse the order. That's what I'm actually asking, yes. But, you know, certainly, you know, if she did not prevail on this claim, we'd appreciate a remand on the cat claim to discuss whether or not there was a, you know, the government was, you know, complicit in her persecution. We think that the main issue here and the answer compelled by this court's decisions, particularly Hernandez-Avalos, requires a remand. Oh, I'm sorry. I'm sorry, not requires a remand. It requires a finding that she was eligible for asylum. One final point on the uncle. I concur with my counsel. The way it was presented below was the family unit was the mother, the husband, the children. The uncle was not part of the family group. That was not part of the definition. And so, and again, I think that kind of goes to show. There was some definition put forward below? Well, I think it was just relying on this case, this court's case law, that suggests the nuclear family is a well-recognized social group. But, again, that's critical because, again, it goes to her unique motivation. It goes to the fact that she was privy to these marital communications. And it goes to why she was perceived as a threat by this gangster. Thank you very much. Thank you very much. Were you appointed to represent her? We represented her since she came over the border. Pro bono. Pro bono. Well, we appreciate your efforts. You did a fine job. Thank you very much. We will come down and greet the lawyers and then go to our third case.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Stephanie D. Thacker